**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joovv Incorporated,<br><br>    Plaintiff,<br><br>v.<br><br>Mito Red Light Incorporated,<br><br>    Defendant. | No. CV-23-01084-PHX-MTL<br><br>**CLAIM CONSTRUCTION ORDER** |

The Court held a *Markman* hearing on March 26, 2024, and now enters the following claim construction Order.

**I. BACKGROUND**

This case concerns a patent dispute over, in the simplest terms, light therapy devices. Plaintiff Joovv Inc. ("Plaintiff") owns the following patents: U.S. Patent No. 10,828,505 ("'505 Patent"), U.S. Patent No. 10,639,495 ("'495 Patent"), U.S. Patent No. 10,478,635 ("'635 Patent"), U.S. Patent No. 11,253,719 ("'719 Patent"), U.S. Patent No. 11,524,172 ("'172 Patent"), and U.S. Patent No. 11,033,752 ("'752 Patent") (collectively, the "Patents-in-Suit"). Defendant Mito Red Light Incorporated ("Defendant") makes the following relevant products: "Mito Red Original," "Mito Red Original 2.0," "MitoMOD," "MitoMODULAR," "Mito Red Room," "MitoPERFORM," "MitoPERFORM Commercial," "MitoPRO," "MitoPRO Commercial," and "MitoADAPT" (collectively, the "Accused Products"). (*See* Doc. 18 ¶ 10.) Plaintiff alleges that Defendant's products

directly and indirectly infringe the Patents-in-Suit. (Doc. 1 ¶¶ 39–94.)

The '505 Patent issued on November 10, 2020. (Ex. B, Doc. 1-3.) The '495 Patent issued on May 5, 2020, and underwent ex parte reexamination, with a certificate issued February 10, 2022. (Ex. A, Doc. 1-2.) The '635 Patent issued on November 19, 2019, and underwent ex parte reexamination, with a certificate issued March 11, 2022. (Ex. C, Doc. 1-4.) The '719 Patent issued on February 22, 2022. (Ex. D, Doc. 1-5.) The '172 Patent issued on December 13, 2022, and it is a continuation of the '635 Patent. (Ex. F, Doc. 1-7.) The '752 patent was issued on June 15, 2021. (Ex. E, Doc. 1-6.)

The Patents-in-Suit generally pertain to "photobiomodulation therapy systems and methods." (*See, e.g.*, Doc. 56-7, Col. 1.) The Background of the Invention section of the specification of the '635 Patent is representative of the area of technology and provides in part:

> Photobiomodulation therapy (or light therapy) is a therapeutic technique that uses low-level wavelengths of light to improve health and treat a variety of health conditions, including skin issues, such as wrinkles, scars, and persistent wounds, among many other conditions. Similar to how plants use sunlight to heal and grow, humans and animals are able to harness these wavelengths of light and turn them into cellular energy. This treatment stimulates the body's natural healing processes.

(*Id.*)

Plaintiff explains that the Patents-in-Suit can be separated into three groups: (1) "a single-panel light therapy device using light emitting diodes ("LEDs"), covered by the '505 Patent, (2) "light control systems for multi-LED panel configurations," covered by the '495 Patent, '635 Patent, '719 Patent, and '172 Patent, and (3) "a bracket system for multi-LED panel systems," covered by the '752 Patent. (Doc. 56 at 8–9.)

Of the Patents-in-Suit, three contain disputed terms: the '172 Patent and the '635 Patent contain the disputed term, "neutral mode," and the '505 Patent contains the disputed term, "slots." (*See generally* Doc. 56, 60, 64.) The disputed term, "neutral mode," is contained in the following '172 Patent claims: dependent claims 5, 6, 8, and 11, and independent claim 12. (Doc. 56-2, 13:19–29, 35–50, 64–67, 14:1–42.) The disputed term,

"neutral mode," is contained in the following '635 Patent claims: dependent claims 5, 6, 7, and reexamination dependent claim 21. (Doc. 56-7, 12:28–53, 2:34–41 (reexamination certificate).) The disputed term, "slots," is contained in independent claim 1 (the sole claim) of the '505 Patent. (Doc. 56-5, 9:31–10:33.)

The parties have asked the Court to construe the above two terms from the Patents-in-Suit. Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), the Court must construe the claims as a matter of law. The parties have filed briefs supporting their proposed constructions of the claim terms. (Docs. 56, 60, 64.) Having considered the arguments and evidence presented in the parties' briefs, exhibits, and at the *Markman* hearing, the Court construes the disputed terms as follows.

## II. LEGAL STANDARD

Claim construction, the determination of the meaning and scope of the asserted claim terms in a patent, is a question of law exclusively within the province of the Court. *Markman*, 517 U.S. at 372; *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). In construing claim terms, considering the intrinsic evidence, such as the language of the claims, the specification, and the prosecution history, is paramount. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc) (quotation omitted). The Court should first "look to the words of the claims themselves," giving them their plain and ordinary meaning, unless clearly stated otherwise. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The plain and ordinary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. The plain and ordinary meaning of a term should control, unless "a patentee sets out a definition and acts as his own lexicographer, or . . . disavows the full scope of a claim term either in the specification or during prosecution." *Torner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The claim language can provide insight based on the context of how the terms are used and by comparison to the use of the same or similar terms in other claims in the patent. *Phillips*, 415 F.3d at 1314.

The Court next looks to the patent specification as "the single best guide to the meaning of a disputed term" because it is "usually dispositive." *Id.* at 1315; *see also Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (explaining that "claims must be construed so as to be consistent with the specification"). Courts therefore may rely heavily on the written description of the claims in the specification for guidance. *Phillips*, 415 F.3d at 1317. When reviewing the specification, however, courts must avoid reading limitations from the specification into the claims. *Id.* at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Courts should also consider the patent's prosecution history, or the record of the patent application proceedings before the United States Patent and Trademark Office (the "USPTO"). *Phillips*, 415 F.3d at 1317. The prosecution history, although lacking the "clarity" of the specification, is also part of the intrinsic record and provides evidence of how the USPTO and the inventor understood the patent and what its claims cover. *Id.* In particular, the prosecution history may provide evidence on whether the inventor limited the scope of the claimed invention to obtain the patent, thereby making the claim scope narrower than it otherwise would be. *Id.*

The Court may also consider extrinsic evidence, such as technical dictionaries, learned treatises, and the testimony of experts and inventors.[1] *Id.* For example, expert testimony can help "ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. But the Court must discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* (internal

---

[1] "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318.

quotations omitted). Although it may prove useful, extrinsic evidence is less significant than the intrinsic record for determining the meaning of claim language. *Id.* In most situations, analysis of the patent and its prosecution history will resolve any ambiguity in a disputed claim term. *Vitronics*, 90 F.3d at 1583.

### III. CLAIM CONSTRUCTION

The following chart summarizes the parties' agreed claim term constructions, which the Court adopts.

| Claim Term | Term Location | Adopted Construction |
|---|---|---|
| "configured to physically contact" | '172 Patent, Cl. 1 | Designed to enable physical contact |
| "switch" | '495 Patent, Cl. 1, 18<br>'719 Patent, Cl. 10 | An interactive interface |
| "winching system" | '505 Patent, Cl. 1 | A system utilizing a winch |

The following chart summarizes the Court's adopted constructions for each of the disputed claim terms. The analysis supporting the construction follows.

| Claim Term | Term Location | Adopted Construction |
|---|---|---|
| "neutral mode" | '635 Patent, Cl. 5, 6, 7, 21<br>'172 Patent, Cl. 5, 6, 8, 11, 12 | A mode wherein the device ignores instruction from another device |
| "slots" | '505 Patent, Cl. 1 | Slot-shaped openings |

#### A. "neutral mode"

Plaintiff proposes the following construction: "a mode wherein the device ignores instruction from or operates independent from another device." (Doc. 54 at 2.) Defendant proposes the following construction: "a mode wherein the device ignores instruction from another device." (*Id.*)

Both parties argue that because the specifications of the '635 Patent and the '172 Patent are identical, the Court must construe the claim term "neutral mode" to have the

- 5 -

same meaning in each patent's respective claims. (Doc. 56 at 12; Doc. 60 at 5.) The parties cite to *Ballard Medical Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352 (Fed. Cir. 2001), to support this notion. The relevant portion of *Ballard* states the following:

> Because means-plus-function claims derive their scope from the structure disclosed in the written description, and because the two patents share the same written description, all of the means-plus-function claims at issue in this case derive their scope from the same disclosed structure. For that reason, [the patentee's] characterizations of the valve described in the original specification of the [parent] application presumably apply to all of the means-plus-function claims at issue in this case, at least in the absence of some indication that the structure referred to in the means-plus-function limitations should be construed differently for some claims than for others.

*Id.* at 1360–61. However, *Ballard* is of minimal relevance to the present case because neither party asserts, nor does the Court find, that the claims asserted here are "means-plus-function" claims.[2] The Court nonetheless finds that Federal Circuit precedent directs the Court to apply its construction of the disputed term, "neutral mode," equally to the term's use in the relevant claims of both the '635 Patent and the '172 Patent. *See, e.g.*, *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1311 (Fed. Cir. 2017) (finding that the multiple asserted patents' identical specifications supported the district court's identical construction of a term that was common among the asserted patents' claims).

The Federal Circuit has also held that "[a] statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) (citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)). Thus, the Court finds that it may consider statements made throughout the prosecution

---

[2] Means-plus-function claims are unique and are statutorily defined in the following manner: "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f).

history and applicable reexamination of both the '635 Patent and the '172 Patent when construing the disputed term, "neutral mode," present in the two related patents.

Plaintiff supports its construction, including the phrase "operates independent," by pointing to the specification of the '635 Patent, which states the following: "when the second light therapy device operates in the neutral mode the second light therapy device may operate independently of the first light therapy device." (Doc. 56 at 11 (citation omitted).) Plaintiff next correctly defines "claim differentiation" as the notion that "'the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not in the [claim from which it depends].'" (Doc. 56 at 12 (quoting *Phillips*, 415 F.3d at 1315).) Plaintiff argues that this doctrine requires the addition of "operates independently" because claims 5 and 6 of the '635 Patent recite "neutral" but do not require ignoring instruction like claim 7 of the '635 Patent. (*Id.* at 12.) Plaintiff also points out that claim 6 of the '172 Patent describes "neutral mode" as each light therapy device "perform[ing] operations independently" of the other light therapy device. (*Id.* (citation omitted).) Finally, Plaintiff identifies claim 11 of the '172 Patent, which Plaintiff states "requires that when each panel is in the neutral mode it uses its own light control commands from the consumer, i.e., it is operating independent from the other devices." (*Id.* at 13.)

Defendant supports its construction eliminating "operates independent from" by providing a detailed chronology of the reexamination of the '635 Patent and the prosecution of the '172 Patent. (Doc. 60 at 5–8.) Specifically, Defendant asserts that in the prosecution of the '172 Patent, in response to a rejection of claim 12 based on two prior art references, Plaintiff argued to the USPTO that Plaintiff's "neutral mode" was different from that in the prior art because "[i]nsofar as [the cited prior art] may be configured to operate independently, . . . both references still fail to teach or disclose a device operating in a neutral mode such that the device 'ignores instructions' from another device, as recited in amended Claim 12." (*Id.* at 7.) Defendant further argues that statements in the prosecution history rebut a presumption established through the doctrine of claim differentiation. (*Id.*

at 9.)

Plaintiff addresses Defendant's arguments regarding prosecution history estoppel in its reply brief. Plaintiff asserts that the statement to which Defendant cited was "one obscure argument" made "well after three (3) reexamination examiners approved the 'operates independently' reference in claim 21 in the '635 [P]atent." (Doc. 64 at 7.) Plaintiff argues that the statement does not amount to a "clear disavowal of claim coverage." (*Id.*) Additionally, Plaintiff asserts that limiting the definition of "neutral mode" to simply "ignoring instruction" would render claim 7 of the '635 Patent, which recites an ignoring instructions limitation, redundant to claim 1 of the '635 Patent, which does not recite such a limitation. (*Id.* at 8.)

Plaintiff correctly points out that under the doctrine of claim differentiation, where possible, the Court should construe claim terms in a manner that does not render claims to be redundant. The Court believes, however, that Plaintiff has applied this principle inconsistently. Plaintiff argues that because dependent claim 7 of the '635 Patent specifically covers "ignoring instructions," the construction of "neutral mode" cannot simply be "ignoring instructions" because dependent claim 7 would then be redundant. The Court notes, however, that claim 6 of the '172 Patent and claim 21 of the '635 Patent explicitly claim a neutral mode in which one or more light therapy devices operate independent from the other light therapy device in the system. As such, Plaintiff's proposed definition (ignores instructions *or* operates independently, i.e., only one at a time) would render claim 6 of the '172 Patent and claim 21 of the '635 Patent redundant.

Additionally, Plaintiff's previous statement when prosecuting the '172 Patent was not merely an "obscure statement." To the contrary, Plaintiff explicitly acknowledged that the cited prior art "may be configured to *operate independently* (i.e., in a neutral mode of sorts)," and explicitly distinguished claim 12 in particular of the '172 Patent by stating the cited prior art "failed to teach or disclose a device operating in a neutral mode such that the device '*ignores instructions*' from another device." (Doc. 56-3 at 445 (emphasis added).) As such, Plaintiff's statement as to claim 12 was clear, and the distinction was material to

1  the patentability of claim 12 of the '172 Patent. As the Court has previously discussed, statements made in proceedings before the USPTO involving related patents regarding a term common to each of the patents are relevant to all related patents, regardless of when the statement was made. Thus, the Court may properly consider this statement regarding the meaning of "neutral mode" in claim 12 when construing "neutral mode" in the context of both the '635 Patent and the '172 Patent.

Considering the above issues, the Court first finds that the term "neutral mode" cannot itself be construed to mean only "operates independently," which would be the effect of the disjunctive "or" construction, "operates independently *or* ignores instructions," as Plaintiff proposes. Plaintiff may not have clearly *disavowed* "operates independently" entirely, as the statement made in the '172 Patent's prosecution history does not explicitly state that the devices *never* "operate independently"; the statement instead makes clear that in claim 12 specifically, the "neutral mode" contemplated is defined as "ignor[ing] instructions." The Court thus determines that based on the USPTO requiring Plaintiff to amend claim 12 to mean just (and specifically) "ignor[ing] instructions," it is improper to infer that claim 12 contemplates "ignor[ing] instructions" *or* "operat[ing] independently." Therefore, the Court cannot conclude that the term, "neutral mode," *itself* could mean "operat[ing] independently."

Additionally, in an effort to construe "neutral mode" according to the principle of claim differentiation, the Court has sought to construe "neutral mode" to mean something broader than simply "ignores instruction." Neither party propounds such a broadened definition. The specification discusses only ignoring signals and operating independently (sometimes phrased as "operate on its own" or as not transmitting a programmed treatment time to any other light therapy device). The Court finds that in light of the specification and prosecution history discussed above, the doctrine of claim differentiation is of little assistance in construing the term, "neutral mode." *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009) (citations omitted) (holding that the doctrine of claim differentiation is "not a rigid rule but rather is one of several claim construction

tools").

Moreover, it is unclear to the Court why a light therapy device in the claimed system of light therapy devices could not both ignore instruction (the Court's construction of "neutral mode") and operate independently (an added limitation where applicable in the claim language). Plaintiff's counsel appeared to attempt to draw such a categorical distinction at the claim construction hearing; however, the Court is unpersuaded that, in the context of the specification and claim language, ignoring instruction and operating independently are mutually exclusive concepts.

Considering the foregoing, the Court finds it proper to construe "neutral mode" to itself mean "a mode wherein the device ignores instruction from another device." The Court emphasizes that this construction does not inherently eviscerate any claim that explicitly references operating independently. In that instance, the claim would refer to a light therapy device both ignoring instruction—the construction of "neutral mode" itself—and operating independently—the added limitation in some claims.

### B. "slots"

Plaintiff proposes the following construction: "slot-shaped openings." (Doc. 54 at 4.) Defendant proposes the following construction: "slot-shaped openings for ventilation." (*Id.*)

Plaintiff argues that the term "slots" should not be limited just to slots "for ventilation" because the specification of the '505 Patent (1) lists slots for ventilation as "additional embodiments," (2) only sometimes specifically contemplates "ventilation slots" and other times does not provide for such a limitation, and (3) and does not expressly limit the "ventilation openings" to being a slot-shaped opening. (Doc. 56 at 14–15 (citations omitted).) Plaintiff asserts that this Court must not "read in" a ventilation limitation when the specification contemplates slots for ventilation, but the claim does not so limit the term. (*Id.* at 15.) Plaintiff further argues that this Court should not construe the non-functional claim term "slots" to include a functional phrase "for ventilation" where infringement or validity would turn on the function. (Doc. 64 at 11.)

Defendant supports its narrower construction requiring that the slots be for ventilation by arguing that while prosecuting the '505 Patent, Plaintiff argued—and the USPTO acknowledged—that "slots" and "openings" for attachment members are separate from each other, and that Plaintiff's proposed construction would render no meaningful difference between the two types of openings. (Doc. 60 at 13.) Further, Defendant argues that the specification "repeatedly and consistently" characterizes "slots" as for ventilation, making it appropriate for this Court to construe "slots" in this limited fashion. (*Id.* at 15.)

The Court acknowledges the longstanding challenge of reconciling two core axioms of claim construction: (1) that the Court should not unjustifiably read a limitation into a claim from the specification (as Plaintiff emphasizes), and (2) that claims must be read in view of the specification (as Defendant emphasizes). *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (discussing the tension between the two axioms). Plaintiff is correct that "even where a patent describes only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope.'" *Id.* (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2002)). However, Defendant also is correct that "when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (citations omitted). Here, the Court finds that the patentee did not express a clear intention to limit the claim scope.

Indeed, the only function explicitly discussed in the specification is that of "ventilation" or "allow[ing] air flow"; however, the patentee still evidenced an intent for the term, "slots," not inherently to mean "for ventilation." For example, the specification makes clear that "slots" and "ventilation openings" are not to be used interchangeably— the specification states that "the ventilation openings may be slots or openings of various other shapes." (Doc. 56-5, 6:50–52.) The specification also mentions "slots" with no mention of ventilation in some instances, (*Id.* at 1:45, 64–65), and specifically mentions "ventilation slots" in other instances. (*Id.* at 7:17–21, 8:28–30.) The Court thus finds that

language in the '505 Patent specification does not rise to the level of "repeated" and "consistent" characterization of "slots" as functioning *only* for ventilation, especially considering the Federal Circuit's caution against "[c]onstruing a non-functional term in an apparatus claim in a way that makes direct infringement turn on the use to which an accused apparatus is put." *Paragon Sols. LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009).

Moreover, although the patentee discussed the "slots" serving a ventilation function in parts of the specification, this function was not characterized in the specification or in the prosecution history as "part of the patent's inventive contribution." *See SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003) ("[T]his is not a case in which a feature was described in the written description as critical but was never explicitly listed in the claim language, suggesting that the relevant structure in the claims should be narrowly construed as having that feature."). As such, the patentee never represented that a ventilation function was crucial to the "slots," further evidencing a lack of patentee intent to so limit "slots."

Finally, the Court agrees with Defendant that "slots" and "openings" for attachment members should not be considered to be the same. However, Defendant has not indicated with specificity how Plaintiff's proposed construction of "slots" swallows up "openings" for attachment members. The claim and specification make clear that the openings exist to receive the attachment members; they are not the same as "slot-shaped openings." Considering the foregoing, the Court construes "slots" according to Plaintiff's proposed construction, "slot-shaped openings."

### IV. CONCLUSION

For the foregoing reasons, the Court construes the disputed claim terms as set forth in the tables above in Part III, *supra*.

Dated this 1st day of April, 2024.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge